UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

TAKIA COE,

        Plaintiff,

-vs-

                                Case No. 14-CV-00022

HOUSING AUTHORITY OF
THE CITY OF MILWAUKEE,

        Defendant.

**BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 21)**

### RESPONSE TO HACM'S STATEMENT OF THE CASE

      HACM's "Statement of the Case" requires comment because it misstates Ms. Coe's

status, through its omissions, on both the law and the facts.  HACM could voluntarily vacate its

own decision. It would cost HACM no money and require no future action. The same,

unfortunately, cannot be said of Ms. Coe's stake in the controversy. To her, the outcome matters.

      The Section 8 Housing Choice Voucher program is national, but administered by

different local public housing authorities.  It is not "project based."  That is, it is not confined to

the bricks and mortar of a specific location.  The Housing Choice Voucher Program is tenant

based, and, as the name indicates, grounded in the tenant's "choice" of where to use the voucher.

Armed with a voucher that represents a benefit entitlement to a rent subsidy, the tenant finds a

private landlord willing to rent within the program, and, if the unit passes federally required

1

conditions inspections, and the rent is within the federally approved limit, the tenant pays approximately 30 % of the tenant's estimated "annual income" – a termed defined by the federal regulation. 24 C.F.R. § 5.609.  The public housing authority that issued the voucher pays the balance of the rent. 24 C.F.R § 982.1(a)(2).

The tenant's voucher benefit is "portable," meaning that tenants may use the voucher entitlement initially approved by one local jurisdiction to rent a unit in the jurisdiction of a different public housing authority.  See, 42 U.S.C. § 1437f(r)(1), 24 C.F.R. § 982.353(b). The initial public housing authority has no power to block to move, other than to terminate the family's eligibility for one of the reasons permitted by 24 C.F.R. § 982.552, or 982.553.  See 24 C.F.R. § 982.355(c)(9).  When a tenant "ports," the receiving public housing authority "must administer assistance" for the family and "issue a voucher to the family." 24 C.F.R. § 982.355(a),(b). It does not re-determine eligibility. 24 C.F.R. § 982.355(c)(1).  The initial public housing authority must send the receiving housing authority HUD form 50058[1]  24 C.F.R. § 982.355(c)(4).  Although the receiving public housing authority does not redetermine program eligibility, it may, (just as could the initial public housing authority at any time absent porting) conduct a "reexamination" that determines the household's "annual income," which in turn, determines the amount of the monthly rent for which the family is responsible.  24 C.F.R. § 982.355(c)(4). The receiving public housing authority may terminate assistance for the federally permitted grounds. 24 C.F.R. § 982.355(c)(10). Which public housing authority pays for the benefits is decided by the receiving public housing authority. The receiving public housing

---

[1] The HUD 50058 is available at http://portal.hud.gov/hudportal/documents/ huddoc?id=HUD50058.pdf Of significance for the present case is sections 7 and 8, which transfer the income information.  "Income" is annual income.  "Annual income" is a defined term. 24 C.F.R. § 5.609   All temporary and sporadic income is specifically excluded. 24 C.F.R. § 5.609(c)(9)

2

authority may bill the initial public housing authority the costs of the subsidy benefits and program administration, or, the receiving public housing authority may "absorb" the porting family into its own program. 24 C.F.R. §982.355(5)  If the receiving public housing authority "absorbs," the family is assisted with funds of the receiving authority. 24 C.F.R. § 982.355(d)

With that legal framework filled it, HACM's factual omissions from its "Statement of the Case" need to be corrected. In 2013, during the seven months between completion of the post-hearing briefs and the Hearing Examiner's November 19 2013 Decision (Doc. 11-2, pp. 106-111)[2], Coe ported her eligibility to West Allis. (Doc. 19, ¶ 28)[3]  After the adverse November 19, 2013 Decision, and after this litigation was commenced in state court, West Allis informed HACM that West Allis would "absorb" Ms. Coe, effective March 1, 2014.  (Petty Aff., Ex. F, HUD form-52665)  HACM is, therefore, no longer financially responsible to use any of its HUD provided resources to pay for either Ms. Coe's benefits. It is true, as HACM's brief contends, that vacating the Hearing Examiner's November 19, 2013 Decision, whether by HACM or by judicial order, "will not produce any result that affects Coe's status in HACM's program – because Coe has no status in HACM's program."

Ms. Coe's continuing stake in the controversy, however, is her right to port. Any future receiving public housing authority could, in theory, use HACM's erroneous application of federal law as a ground to terminate Ms. Coe's assistance because a future public housing

---

[2] The date of the Decision is November 19, 2013.  However, the Decision faxed on November 21 with a cover letter dated November 21, 2013.  (Doc. 11-2, p. 105).

[3] HACM's November 5, 2014 summary judgment brief (Doc. 21 at 1) asserts that Ms. Coe "voluntarily moved to the City of West Allis" "more than two years ago." The assertion is not supported by any citation to the record. The Stipulation (Doc. 19, ¶28) states that in "approximately mid-2013, Coe became a participant in the City of West Allis Housing Authority's rent assistance program and is receiving her monthly rent subsidy through that local public housing authority."

3

authority may terminate if "a PHA has terminated assistance under the program for any family member." 24 C.F.R. § 982.552(c)(1)(iii).

HACM's "Statement of the Case" is also false in its claim that "Coe has already fought and lost the merits of that question once before." (Doc. 21, at 2) Again, there is no citation to any part of this record (or any record) to support that purported statement of fact. What Magistrate Judge Gorence adjudicated in the prior litigation was that HACM failed to provide constitutionally sufficient notice to Ms. Coe and that HACM's failure in her case was part of HACM's custom of violating the Due Process Clause in that manner. (Doc. 11, at 46-50 of 120) The other parts of Magistrate Judge Gorence's decision are (1) HACM opted out of Wisconsin Statutes Chapter 68 (and therefore a valid state law certiorari claim had not been alleged because a common law certiorari claim was not alleged), and (2) there was no evidence that the unconstitutional conduct by the hearing examiner in the manner of conducting Ms. Coe's first hearing were part of a HACM policy or custom. (Doc. 11, at 45-46 of 120) The fact that HACM's grounds for attempting to terminate Ms. Coe's benefit eligibility are not among the grounds permitted by 24 C.F.R. § 982.552 or § 982.553 was not alleged or litigated. HACM's brief's claim in the "Statement of the Case" that the merits were previously adjudicated is false.

## RESPONSE TO HACM'S STATEMENT OF FACT

HACM's brief is seriously misleading in its misstatements of both the undisputed facts and the law. HACM's first faulty assertion is that Program participants can be terminated for violating local program rules. As discussed more fully below, the federal regulations, 24 C.F.R. § 982.552 and § 982.553 list the only grounds for which a Housing Authority may terminate a Section 8 participant. One of § 982.552 grounds is violating a "family obligation." "Family obligations" are defined in 982.551(b). The material "family obligation" in this case is the

4

"family obligation" in 982.551(b)(2). "Violating any local program rule" is not a ground public housing authorities are allowed to terminate participation in the Program. *See,* 24 C.F.R. § 982.552. A "local program rule" might, of course, track a "family obligation" pursuant to 24 C.F.R. § 982.551, but "violation of a local rule" *per se* is not a ground for termination. (Pl's Resp. to DPFF ¶ 82)[4]

Second, HACM's account of the administrative process of the Section 8 Rent Assistance Program is incomplete. (Doc. 21, at 3-4). It is true that the Rent Assistance Program is an income based benefit where participants' total rent payment is limited to 30 percent of adjusted annual income. It is not true, however, as HACM's brief incorrectly implies, that a household's monthly rent contribution "is contingent upon gross household income." (Doc. 21, at 3) The process is far more complicated and goes directly to why "violating a local program rule" is not, *per se*, a federally acceptable ground to terminate eligibility.

"Income" for the Housing Choice Voucher Program is annual income, and there is a lengthy process by which income is verified and the tenant's rent portion adjusted. A tenant's monthly rent portion is a fraction (one-twelfth) of the 30 percent of "adjusted annual income," not the income of a given month, or a multiple of income for some portion of a month. (Pl's Resp. to DPPF, ¶5). Unlike some public assistance program where the amount of benefits varies monthly, rent assistance does not vary month to month because the federal regulations require local housing authorities to "annualize" income prospectively unless the housing authority chooses a shorter period at which it will make another redetermination of income. 24 C.F.R. §§ 5.609(a)(2), 5.609(d). Monthly variations, up or down, do not change the tenant's (or housing

---

[4] Plaintiff's Response to Defendant's Proposed Findings of Fact, being filed contemporaneously with this brief.

authority's) portion of the rent payment. For that reason, the federal regulations specifically exclude seventeen categories of income, including all income that is "temporary, nonrecurring, or sporadic." 24 C.F.R. § C.F.R. § 5.609(c)(9)

The administrative process by which a tenant's monthly rent contribution (1/12 of 30% of adjusted annual income), is called, interchangeably, "recertification" or "redetermination" or "reexamination."[5] HACM is required to conduct a reexamination of family income and composition at least annually, which includes the verification of family annual income, value of assets, expenses related to deductions from annual income, and other factors that affect the determination of the total rent amount. (Pl's Resp. to DPFF, ¶6) One of the forms participants complete during the recertification process is the "Personal Declaration" form. Contrary to HACM's assertion (Doc. 21, at 4) the Personal Declarations Ms. Coe signed while a participant of HACM's Rent Assistance Program (Docs. 13-18 [2007], 13-7[2008] and 13-9[2009] did not state "that a participant would be terminated if the information on the form was incorrect." (Pl's Resp. to DFPP, ¶16) HACM's misstatement, though it must be corrected, is not particularly material. It is undisputed that Ms. Coe's 2009 Personal Declaration (Doc. 13-9) – the form that she received on or about February 19, 2009 and was to be returned on or before her April 7, 2009

_____

[5] Some idea of the length and depth of the recertification/reexamination process is apparent from the undisputed facts of Ms. Coe's 2009 annual reexamination. On February 19, 2009, Ms. Coe was notified that her annual reexamination appointment was scheduled for seven weeks later on April 7, 2009. (Doc. 13-29) The income verification materials Ms. Coe was required to assemble included obtaining employment verification from her then brand new employer (of two days), Precious Transit, LLC. Ms. Coe's "Personal Declaration "Form" (Doc. 13-9) lists Precious Transit, and the verification of her employment (Doc. 13-10) was faxed to HACM on March 30, 2009, a week **before** the reexamination appointment. HACM's argument is that Ms. Coe can be terminated because she did not **also,** in addition to supplying all information timely and truthfully during the annual reexamination process, separately give HACM another written "notice" that she had just commenced employment with the employer she was verifying during the annual reexamination.

6

recertification appointment – contained the truthful, accurate, information about Ms. Coe's then recent (two day) permanent, full time employment with Precious Transit, LLC.

Third, HACM either omits or misstates the most significant facts about the 2009 recertification meeting. The most serious, and unsupported, claim in HACM's brief is its characterization that Ms. Rogowski "based on her review the file indicated that Coe might not have been disclosing all of her income." (Doc. 21, at 5) The brief's mischaracterization purposefully obfuscates the difference between the truthful, accurate disclosures by Ms. Coe during the recertification interview with the time frame of one of HACM's multiple, inconsistent income reporting rules. Rogowski cannot remember the specifics. She remembers that she warned Coe about reporting income, and that there was an "issue," but that she could not remember what the warning was about.  (Pl's Resp. to DPFF, ¶19). From all the record supports, Rogowski reminded Ms. Coe of HACM's "two week" reporting rule. It is undisputed, however, that at the recertification meeting, on the Personal Declaration form Ms. Coe supplied the information requested for use in the annual reexamination, specifically, the permanent full time employment with Precious Transit, LLC and verified in writing to HACM, as early as March 30, 2009, that the employment (though not necessarily the income) had commenced two days before the annual recertification process began. (Doc. 13-9 at 2, Doc. 13-10)  It is also undisputed that Rogowski recertified Ms. Coe for another year of participant in the program despite whatever the "issue" that arose regarding her income.  (Pl's Resp. to DPFF, ¶20).

Fourth, virtually all of HACM's briefs characterizations relating to the April 19, 2010 meeting (Doc. 21, at 6-7) are disputed.  About the only things about the meeting that are not disputed is that the occasion for the meeting was an allegation by the disgruntled teenage boyfriend (Lattimore) of Ms. Coe's teenage daughter and that the meeting occurred a full year

7

**after** Ms. Coe's April 2009 recertification meeting. Ms. Loberg testified that the she had begun to look at Ms. Coe's program file the morning Mr. Lattimore came to Program in April 2010. (Pl's Resp. to DPFF, ¶ 21)  The proposed facts presented by HACM are all disputed by Ms. Coe. (Pl.'s Resp. to DPFF, ¶¶ 22-36)  Ms. Coe denies admitting that she allowed the Portis/Lowe family to move in with her.  (*Id.*).  Beyond a question regarding her temporary employment at UMOS (the income from which is excluded from the federal definition of "annual income"), Ms. Coe denies that the meeting included a discussion regarding her income.  (*Id.*)

On April 29, 2010, ten days after the April 19 meeting, HACM issued Ms. Coe a Notice of proposed termination from the Program.  Ms. Coe requested a hearing on May 12, 2010.  It is undisputed that Loberg created a written memo purporting to summarize the April 19, 2010 meeting. Whether the memo is contemporaneous, and whether Loberg has covered up its lack of contemporaneity, is very much disputed. There is evidence from which a reasonable finder of fact could determine that Loberg created the memo on May 13, 2010, the day after HACM received Coe's request for a hearing.   The metadata available for the document evidences that the memo was both created and printed on May 13.  (PPFOF, ¶¶ 34, 37-38). The parties have agreed to defer Loberg's deposition, but her veracity is very much disputed and an inference of her dishonesty is supported by admissible evidence.

### RESPONSE TO HACM'S STATEMENT OF PROCEDURAL HISTORY

The most signification mischaracterization HACM makes regarding the prior litigation between the parties relates to the June 4, 2014 Decision issued by Judge Gorence on cross-motions for summary judgment.  That decision is discussed *supra* in the Response to HACM's Statement of the Case." (Pl's Resp. to DPFF, ¶¶40-41).

8

**RESPONSE TO HACM'S DESCRIPTION OF THE PROCEEDINGS POST *COE I***

As a result of *Coe I*, HACM issued Ms. Coe a new notice of proposed termination on July 10, 2012. HACM's Notice of Continued Eligibility lists 6 grounds for proposed termination. The Notice cites two federal regulations stating grounds for termination: (1) the "fraud, bribery or any other corrupt act" provision in 24 C.F.R. § 982.552(c)(1)(iv), and (2) HUD's "family obligation," duty described in 24 C.F.R. § 982.551(b)(2) to supply "any information requested by the PHA or HUD for use in a regularly scheduled reexamination or interim examination of household income and composition." (PPFOF, ¶47).

The Notice cites four other alleged grounds for terminating eligibility. The first is HACM's "15 business day rule". HACM does not attribute that ground to any federal regulation. The provision does not refer to household composition. Second, HACM's Notice cites from the HUD Voucher that a family "must promptly notify the PHA in writing if a family member no longer lives in the unit." The Notice does not suggest which family member no longer lives in the unit. Finally, HACM's Notice cites two make weights: HUD's voucher language that information be truthful and complete and HUD policy documents about recovering overpayments.[6] (PPFOF, ¶48) There is no assertion in the Notice that any of these listed grounds for proposed termination relate to an issue of nondisclosure of housing members or a violation of the household composition rule. (Pl's Resp. to DPFF, ¶¶44,49).

---

[6]Hearing Examiner Bobot did not sustain HACM's claim that Ms. Coe had been overpaid her rent subsidy. With respect to the temporary employment income prior to Ms. Coe's 2009 annual reexamination, HACM did not establish that receipt of income from the temporary employment (even if not excluded by 24 C.F.R. § 5.609(c) from the definition "annual income") actually increased. With respect to the 2009 annual reexamination including the Precious Transit, LLC permanent employment, there is no dispute that the income was verified during the annual certification process and that the employment began only two days before the annual recertification process began.

9

Enclosed with the Notice were documents HACM produced to support its position that Ms. Coe violated the income reporting, but there is no rule or federal regulation contained in the Notice that relates to some household composition rule. (Pl's Resp. to DPFF, ¶¶ 44, 49). HACM's "15 business day" income reporting rule cited in the notice (one of its at least four versions) does not apply to reporting changing in household composition.

HACM's discussion of the second hearing is contained on pages 9-10 of its brief and requires four points in response. First, Loberg's recollection of her investigation regarding Ms. Coe and her recollection of the meeting on April 19, 2010 between Coe and Program staff is disputed by Ms. Coe. (Pl's Resp. to DPFF ¶¶ 60, 62-66, 68). Second, the 21 exhibits introduced by HACM in support of its position that Ms. Coe violated program rules fail to support a finding of fraud in the household composition because there is no evidence of any economic benefit to Ms. Coe. Third, the 21 exhibits fail to support a finding that Ms. Coe failed to "supply any information requested by the Rent Assistance Program or HUD for use in a regularly scheduled reexamination or interim reexamination of family income and composition in accordance with HUD requirements." (Pl's Resp. to DPFF, ¶ 70).

Fourth, HACM mischaracterizes Ms. Coe's second informal hearing testimony. Coe testified that she understood income reporting requirements at it relates to the annual reexamination process. Her testimony that is cited by HACM on page 10 of its brief is limited to a discussion regarding reporting income during annual reexaminations. (Pl.'s Resp. to DPFF, ¶ 73; Doc. 21, p. 10). Most significantly, HACM mischaracterizes Coe's testimony regarding the reporting of her income. In regard to Ms. Coe's 2008 annual recertification meeting, her income was reported. Ms. Coe simply testifies that the income amounts were not listed on the Personal Declaration form, although reported on separate HACM recertification documents. (Pl.'s Resp.

10

to DPFF, ¶¶ 74-75)  Additionally, Ms. Coe's testimony reflects that she does not admit that she did not report income from QPS.  The question that is asked of her is a double negative and when she answers "no," she responds that the questioner's assertion of purported fact is incorrect. (Pl's Resp. to DPFF, ¶ 78).  The same line of questioning is used regarding her temporary employment income from Hatch. Ms. Coe answers "no" to a double negative question.  (Pl's Resp. to DPFF, ¶ 79).  After counsel for HACM read into the record a portion of Coe's prior hearing testimony, she responds "no" to the accuracy of the assertion of purported fact that she never reported the 2008 income.  (PSPFOF, ¶ 10).

At the conclusion of the hearing, Coe's counsel requested a briefing schedule.  (Pl.'s Resp. to DPFF, ¶ 91).  Counsel's request for a briefing schedule is not the equivalent to waiver of an administrative deadline to issue a decision as the briefs would be part of the record in which the hearing examiner bases his decision.  (Pl's Resp. to DPFF, ¶¶ 91, 92)

The content of the Hearing Decision that was issued on November 19, 2013 is not disputed.  The Decision is limited to two findings:  (1) Ms. Coe failed to report her 2009 Precious Transit income within 15 business days, and (2) Ms. Coe fraudulently failed to report changes in her family composition.   (Doc. 11-2, p. 107-111)  The decision does not sustain HACM's claim that Ms. Coe was overpaid benefits.

## RESPONSE TO HACM'S DESCRIPTION OF SECTION 8 RENT ASSISTANCE PROGRAM

HACM's recitation of the scope and purpose of the Section 8 Rent Assistance Program and its requirements is inaccurate and misleading.  It is true that participants must follow federal regulations as well as legally valid policies contained in HACM's administrative plan, but this is half of the story.  HACM is also required to follow federal regulations, and the content of its

11

Administrative Plan must be in accordance with HUD regulations. 24 C.F.R. § 982.52. The policies contained in HACM's administrative plan must be in accordance with HUD requirements. 24 C.F.R. § 982.54(a). The administrative plan states PHA policy on matters in which the PHA has the discretion to make local policies. *Id.*

HACM's claim that a person's income is key to the determination of program eligibility is too simplistic. (Doc. 21, p. 11-12) As discussed above, the necessary result of the HUD's requirement that income be "annualized" is to eliminate variations caused by the receipt of income from temporary sources. While it is true that permanent changes in annual income will affect a tenant's portion of the rent after the next reexamination, it is only changes in "adjusted annual income," not the income for a given month, that even register in the equation. 24 C.F.R. § 5.628 [Total tenant payment], § 5.603 [definition of "Monthly adjusted income" and "annual income"], § 5.611 [Adjusted income], and § 5.609 [Annual Income]. "Annual income," and, therefore "adjusted annual income" specifically excludes more than 20 specific kinds of income, including, among other things, "temporary, non-recurring or sporadic income (including gifts)," all income from employment of children under 18, and all earnings in excess of $480 annually for each full-time student 18 years or older. 24 C.F.R. § 5.609(c). (Pl.'s Resp. to DPFF, ¶ 5).

It is undisputed that Program participants must identify all people living in their rent assisted unit. However, the federal regulation cited by HACM does not support the legal conclusion it is making regarding household composition. (Doc. 21, Def's Br. at p. 12) The applicable federal regulation that governs household composition was not a ground cited in the defendant's July 2012 Notice of Continued Eligibility. (Pl's Res. to DPFF, ¶¶ 44, 49; Doc. 28, ¶ 55, [PPFOF, ¶ 55])

Finally, a program participant can only terminated for grounds permitted by federal law.

12

Federal regulations list the only grounds for which a Housing Authority may terminate a Section 8 participant. *See* 24 C.F.R. § 982.552(a) ("[A] PHA may deny assistance for an applicant or terminate assistance for a participant under the program because of the family's action or failure to act as described in this section or § 982.553."). These grounds are exclusive; termination for grounds not identified in the regulations is illegal. *See, e.g., Ellis v. Ritchie*, 803 F. Supp. 1097, 1101 (E.D. Va. 1992) ("Termination decisions must be made in accordance with these regulations."); *Hill v. Richardson*, 740 F. Supp. 1393, 1398-99 (S.D. Ind. 1990) (noting that the § 8 regulations provide exclusive list of grounds on which assistance may be terminated). Accordingly, there are many "program rules," violation of which cannot lead to termination. (Pl.'s Resp. to DPFF, ¶ 2).

## ARGUMENT

**I. HACM's inconsistent reporting rules violate Ms. Coe's federally protected right not simply because they are inconsistent with each other, but because they contravene federal regulations with respect to scope, timing and consequence.**

> **A. HACM's decision to use violation of its inconsistent income/household composition reporting rules (which ever it applied) as a ground to terminate eligibility is the violation of the federally protected right that local housing authority not terminate eligibility for non-compliance with a local rule not included among the federally acceptable grounds for terminating eligibility.**

HACM's first argument is that federal regulations permit, indeed, require, it to have income/household composition reporting rules. If HACM was not attempting to terminate Ms. Coe's benefit eligibility, HACM's argument would be valid**.** HUD mandates a number of things, including that local public housing authorities have an administrative plan, and that they have policy "when and under what conditions the family must report a change in family income or composition." 24 C.F.R. § 982.516(c). So far as HUD is concerned, HACM is free to have its multiple, inconsistent reporting rules.

13

It is undisputed that HACM has at least four, different, reporting rules, some on both income and household composition, some on income only, and one on income increases only. They are all different. Loberg's original testimony under oath was that it was the rule (Doc. 13-8) to report "any change in income" "within two weeks of the date the change occurred" (PPFOF, ¶ 13). Although Loberg changed that testimony to claim that the reporting deadline is "15 business days," Loberg never identified which "15 business days" "rule."[7] There are, at two different "15 working day rules" and one "15 business days" rule. One "15 working days" rule requires recipients "to report in writing any increase [but not decrease] of income changes (sic) within 15 working days from the date the increase occurs" (Doc. 13-18, at 1). The other "15 working day" rule states "All participants are required to notify the Program [but not in writing] within 15 working days when household income and/or family size increases or decreases." (Doc.13-18, page 2) The fourth rule, the one in the Administrative Plan, is that all changes, increases and decreases, of income (but not household composition) must be reported with "15 business days." (Doc. 13-1, at 1; PSPFOF, ¶ 7)

It is not just that HACM's multiple rules are undeniably in conflict as to the number of days. They also conflict with themselves on whether the change must be reported in writing. The "two weeks" rule, one of the "15 working days" and the "15 business days" rules require written reporting; one of the "15 working days" rule does not require written reporting. They also conflict on whether income decreases, as opposed to only increases, must be reported. The

---

[7] HACM's brief (Doc. 21, p. 18) argues that Loberg "testified that HACM applied the 15 day business day requirement to Coe." (Doc. 21, page 18, citing Doc. 13, at 35, lines 4-6, at 112, ll. 8-15). However, in addition to changing her deposition testimony from 2011 (PPFOF ¶ 13) Ms. Loberg **also** testified **at the same hearing in 2013** that violation of the "two week" rule contained in hearing exhibit 8 [Doc. 13-8] was grounds for termination. See Doc. 13 at 38, ll. 19 – 39, l. 9.

14

"two week" rule is "all changes," one of the "15 working day" rules "increases or decreases," and the "15 business day" rule is "any change," in income (but not household composition), but the other "15 working day" rule requires reporting on increases. Further, Loberg's understanding of what income must be reported (under whichever of HACM's rules is being invoked) is different from the understanding of Assefa Damte and Rogowski recertifying Ms. Coe in 2009 after discussing some now forgotten "issue." (PPFOF, ¶ 15, Pl's Resp. to DPFF, ¶ 19)

The multiple rules are also inconsistent with respect to reporting changes in household composition. The "two week" rule (Doc. 13-8) refers to household composition. But HACM's position now is that Loberg applied the "15 business day," not the "two week" rule, and the "15 business day" rule does not say changes in household composition must be reported within 15 days. (Doc. 13-1, at 1, ¶ 3). One of the "15 working day" rules (Doc. 13-18, at 2) refers to reporting changes in "family size." The other "15 working day" rule (Doc. 13-18, at 1) does not refer to household composition or family size. (PSPFOF, ¶ 8)

Those are the discrepancies among HACM's four different reporting rules that appear from the face of the rules. There are other discrepancies that would be material **if** violation of HACM's income reporting rule was a federally accepted ground to terminate eligibility. First, for example, when the "two week" or "15 day" "clock" begins to run under HACM's rules is, at least in the employment context, equally ambiguous. HACM could say its reporting "clock" begins running when a prospective employee learns he or she has been hired. Or perhaps HACM's rule is that the income "increase" occurs when the employee begins compensated work, regardless of when paid. Equally plausibly, the income "increase" occurs when the employee is first paid. That ambiguity is material to whether Ms. Coe violated one of the "15 working day" rules or the "15 business day" rule because although it is undisputed that Ms. Coe

15

began her employment on February 17, 2009, there is no evidence on when she was first **paid**. Since an employee in Wisconsin need not be paid more frequently that every 31 days, Wis. Stat. § 109.03(1), if Ms. Coe was not paid until mid-month, Saturday March 14, 2009, the facsimile transmission to HACM on March 30, 2009 (Doc. 13-10) **is within** 15 working days or 15 business days.

In addition to the ambiguity as to when the "clock" starts running, HACM's various "rules" are equally ambiguous on what is "income" that must be reported. Loberg claimed, at least initially, that weekly changes in the number of hours of temporary work were required to be reported under the "two week" rule. (PSPFOF, ¶ 6) The federal regulations, however, specifically exclude temporary income from the definition of "annual income." 24 C.F.R. § 5.609(c)(9). As discussed above, Loberg's understanding of what income must be reported is significantly different from her supervisor's understanding or the certification worker's understanding. (PPFOF, ¶ 15, Pl's Resp. to DPFF, ¶ 19)

One part of HACM's legal argument has merit. It is irrelevant which of HACM's four different "rules" HACM is now claiming was violated. Whichever version HACM ultimately settles on, it is a red herring because of the law. HUD permits HACM to have as many inconsistent rules as it chooses. HUD would **permit** HACM to have a rule requiring reporting changes in "annual income" before they occur, or by email only, or in blood. HACM may not, however, terminate eligibility absent fraud or the failure to supply information for use in an annual or interim reexamination. Were HACM not attempting to terminate eligibility, it would be of no moment how many inconsistent income reporting rules HACM has. It is irrelevant because in the absence of fraud or the failure "to supply information requested by the PHA or

16

HUD for use in a regularly scheduled annual reexamination," being tardy under some local rule is not a federally permitted ground.

HACM's argument that one of its multiple, inconsistent reporting rules "permits HACM to have the most current information available to it in calculating benefits" (Doc. 21, at 14) actually crystalizes the issue. The recertification process **is** the process in which a public housing authority calculates the federally defined "annual income," including the income exclusions HACM keeps ignoring, from which the tenant's share of rent is determined from which the housing authority's subsidy obligation is determined. But there is **no claim by HACM** that the information submitted by Ms. Coe during **any** of her multiple recertificiations was false, or omitted a source of income or failed to verify the amount of income. The claim – and it is the only claim with respect to income reporting sustained by the Hearing Examiner – is that 2009 Precious Transit employment that was reported and verified during the 2009 recertification was reported late, that is, in violation of the two week or 15 working day time period, even though it is undisputed that Ms. Coe started her Precious Transit employment on February 17,2009, received the February 19, 2009 recertification notice setting her reexamination appointment for April 7, 2009 and turned in the Personal Declaration form by the April 7, 2009 reporting deadline contained in the notice.

A local public housing authority may terminate eligibility "for the family's action or failure to act as described in this section or 982.553. 24 C.F.R. § 982.552(a). "Fraud" in reporting income would, of course, be a federally permitted grounds to terminate. See 24 C.F.R. § 982.552(c)(1)(iv) HACM charged that ground for terminating Ms. Coe's eligibility. (Doc. 13-1, at 1) The hearing examiner however, specifically found Ms. Coe did not engage in fraud with respect to her reporting of income, whether it is the temporary income excluded from the federal

17

definition of income, or the Precious Transit earned income reported during the 2009 recertification process. (Doc. 11-2 at 108)

Thus, as to the "fraud" rubric permitted as a ground to terminate section eligibility, HACM's decision fails on the facts. Not even the hearing examiner found fraud with respect to income reporting. As to household composition, the hearing examiner shoehorned HACM's position into a legal theory HACM never advanced. On the household composition prong, the position fails on the law. As discussed more fully in Coe's brief in support of her motion for summary judgment (Doc. 26, at 22-23), HUD requires proof of pecuniary gain. 24 C.F.R. § 792.103.

Similarly, failing to "supply information requested by the PHA or HUD for use in a regularly scheduled reexamination or interim reexamination of family income or household composition in accordance with HUD requirements" is a federally permissible grounds to terminate eligibility. See, 24 C.F.R. §982.552(c)(1)(i) [violation of family obligation as ground to terminate], § 982.551(b)(2) [defining "family obligations"]. HACM invoked that federal regulation in its July 10, 2012 "Important Notice Regarding Continued Eligibility" (Doc. 13-1, at 1) Indeed, HACM guilds the lily, observing (Doc. 21, at 14-15) that the "family obligation **to supply information requested for use in an annual or interim reexamination** is contained in Ms. Coe's voucher and in HACM's administrative plan. (Doc. 13-24, at 3, ¶ H1; Doc. 13-21, at 22 of 24, § 21.0, ¶ A; at 7 of 24 ("family obligation" includes "family must supply any information requested by RAP or HUD **for use in a regularly scheduled examination or interim reexamination of family income or composition in accordance with HUD requirements.")** Significantly, neither the voucher nor the administrative plan description of "family obligations" contain any of HACM inconsistent income reporting rules, whether the

18

"two weeks/15 working days" versions, or the increases only or increases and decreases versions, or the in writing or not versions.

HACM presents no evidence, not one scintilla of evidence, that Ms. Coe failed to supply information requested for use in an annual or interim reexamination. It is undisputed, that Ms. Coe began her employment with Precious Transit on February 17, 2009. (PPFOF, ¶ 23)  It is undisputed that Ms. Coe's annual "Recertification Appointment Letter" is dated two days later, February 19, 2009. (Doc. 13-29). It is undisputed that this annual reexamination notice explicitly instructs Ms. Coe her "**recertification responsibilities MUST be completed at Your Appointment.**" (Doc. 13-29)(emphasis in original)  It is undisputed that the annual reexamination notice sets the date for her annual reexamination appointment as April 7, 2009. (Doc. 13-29) It is undisputed that at least by the April 7, 2009 recertification appointment, HACM had Ms. Coe's annual recertification "Personal Declaration Form" reporting "Precious Transit LLC" and child support as her sources of income. (Doc. 13-9, at 2) It is also undisputed that no later than April 7, 2009 (and apparently as early as March 30, 2009)[8] HACM had received income verification from Precious Transit, LLC. (DPFOF, ¶ 101, Pl's Resp. to DPFF ¶ 66).

It bears repeating. The ground for termination is an alleged breach of a "family obligation" by "failing to supply information requested by the PHA or HUD for use in an annual reexamination." 24 C.F.R. § 982.551(b)(2).  It is undisputed that the Precious Transit information was supplied during the 2009 annual reexamination on HACM's forms by HACM's

---

[8] HACM concedes that the Precious Transit income verification document had been received by the April 7, 2009 recertification appointment. (The fax transmittal evidence, including the fax cover sheet and the imprinted fax date and time stamp (Doc. 13-10, at 1 and 2) permit the inference that HACM had the income verification on March 30.

19

reexamination deadlines.   HACM is not arguing that Ms. Coe failed to supply the information as it requested when it requested for use in its annual reexamination.  It is arguing that its deadline (whether it is two weeks as Loberg originally testified under oath or 15 business days as Loberg changed her testimony to) is an independent ground for termination. The federal regulations simply do not support HACM's argument. No language in 24 C.F.R. § 982.551(b)(2) or 982.552 stretches that far.  HACM can have its reporting rule in as many variations and gradations as it chooses.  It simply cannot terminate eligibility for violation one or all of those variations and gradations if the information requested for use in the annual reexamination is supplied.

The case law HACM discussed (Doc. 21 at 15-17) is inapposite and supports Ms. Coe precisely because those cases all involve either a finding of fraud or a breach of the family obligation by failing to provide information requested for use during an annual reexamination. In *Basham v. Freda,* 805 F. Supp. 930 (M.D. Fla. 1992), a preliminary injunction was denied because there was insufficient likelihood of success on the merits of overcoming the fraud finding.  805 F. Supp. at 993.  The family in *Basham* appears to have been requested to provide the information (apparently during an annual reexamination) and withheld the information. 805 F. Supp. 993.  "Fraud" in failing to report annual income, which was found in *Basham,* is a federally permissible ground to terminate. On the facts of the present case, however, the hearing examiner, as could a jury, rejected, the inference of fraud by Ms. Coe in allegedly failing to report the temporary income in prior years or in "tardy" reporting the Precious Transit, LLC employment during the 2009 annual reexamination by the 2009 annual reexamination appointment on April 7, 2009.

Similarly, in *Bowman v. City of Des Moines Housing Authority,* 805 N.W.2d 790 (Iowa Ct. App. 2011), the participant failed to supply information during an annual or interim

reexamination. On June 4, 2009, the housing authority began Bowman's annual reexamination appointment. 805 N.W. 2d at 793. (This corresponds to the April 7, 2009, appointment in Ms. Coe's case. (Doc. 13-29)) It sent Bowman correspondence related to income verification on June 12, 2009 and again on July 10, 2009. 805 N.W. 2d at 793. On July 20, 2009, Bowman provided the housing authority with information regarding her June 19, 2009, notification that Bowman would receive Social Security benefits for herself, but did **not** supply the information that each of her three children would begin receiving benefits. 805. N.W.2d at 794. Three days later, on July 20, 2009 the housing authority completed its annual reexamination **without Bowman supplying** the information she had regarding her children's Social Security income. 805 N.W.2d at 794. The *Bowman* case is, thus, squarely within the language of 24 C.F.R. § 982.551(b)(2) that failure to supply information during the annual reexamination process is a federally accepted grounds for termination. Bowman was not terminated because she was "tardy," in violation of the Des Moines "10 day rule" in reporting income; she was terminated for failing to supply the information during the annual reexamination.

   *Frey v. New York City Dep't of Housing Preservation and Development*, 95 A.D.3d 613 (N.Y. App. Div. 2012) is exactly the same. Frey's eligibility was terminated "on the ground that she had misrepresented her household income on recertification applications." 95 A.D3d. at 613. The misrepresentation might be either fraud under 24 C.F.R. § 982.552(c)(iv) or "failing to supply information requested by the PHA or HUD for used in the annual reexamination" under 24 C.F.R. § 982.551(b)(2). *In re Melendez v. Cestero,* 79 A.D.3d 603 (N.Y. App. Div. 2010), is also exactly the same: "HPD's finding that petitioner misrepresented her income in her 2005, 2006, and 2007 recertification packages is supported by substantial evidence." 79 A.D.3d at 604. The failure to supply the requested information in recertification packages is exactly the

21

failure to "supply information requested by the PHA or HUD for use in a regularly scheduled reexamination or interim reexamination" identified in 24 CF.R. § 982.551(b)(2). Although less clear, the citation in *Peterson v. Washington County Housing and Redevelopment Authority,* 805 N.W.2d 558, 562 (Minn. App. 2012), of 24 C.F.R. § 982.551(b)(2), and Peterson's false statements during the annual certification process, 805 N.W.2d at 560, indicate that it was the failure to provide the truthful information during recertification, as opposed to the violation of the local housing authority's "5 day" rule, that sustained the termination.

**B. HACM's reporting rules, whether income or household composition, are a Monell "policy," execution of which results in entity liability which HACM's has adopted as correct.**

Beginning at page 18 of its brief (Doc. 21), HACM argues that it is entitled to summary judgment on the §1983 claim, alleged in paragraph 26(b) of the Complaint (Doc. 1, at 10) that the Due Process Clause was violated in HACM's using a ground for termination not contained in the notice. HACM is correct, that, after discovery, there is insufficient evidence to show that changing the basis of a proposed decision from the grounds alleged in the notice was sufficiently common to be a "custom" under *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). HACM is also correct that the hearing examiners it has employed (Ramirez and Bobot) are not employees of HACM. (Doc. 21, at 20-21) HACM is also correct that entity liability may not, under *Monell,* attach vicariously under a *respondeat superior* liability theory. (Doc. 21, at 18-19)

That does not mean, however, that HACM escapes liability. Entity liability attaches under *Monell* when the "execution of a government's policy or custom, whether made by its law makers or by those whose edicts or acts may fairly be said to represent official policy inflicts the injury." *Monell,* 436 U.S. at 694. *Monell* itself is a good illustration that entity liability attaches, not via *respondeat superior* vicarious liability, but because the subordinate executes the policy.

22

The policies in question in *Monell* were a Board of Education policy and a Department of Social Services policy that pregnant women had to take unpaid leave. Obviously, low level employees – principals, supervisors, human resources payroll clerks, etc. – executed the policy. The execution of the policy by the non-policy making employee attaches entity liability, not *respondeat superior.*

The HACM policy in this case is that it will terminate rent assistance eligibility for violation of its local reporting "rule" on reporting changes in income or household composition. That policy is executed by Loberg or Williams or Ramirez or Bobot, but it is the entity's policy, execution of which causes the deprivation of the federally protected right to have eligibility terminated only for reasons permitted by the federal regulations.

Thus, HACM's liability in this case is different from HACM's entity liability in the first *Coe* litigation. HACM had no policy in *Coe I* that persons in Loberg's position drafting notices attempting to terminate benefits should give constitutionally defective notices. Thus, liability in *Coe I* required proof that the frequency with which persons in Loberg's position gave constitutionally defective notice was so large that the practice of giving constitutionally defective notice was a custom. That fact was adjudicated in *Coe I*. Similarly, in this case, there is no HACM policy that that hearing offices deviate in their decisions from the grounds stated in the notices. The unsuccessful alleged theory of entity liability of paragraph 26(b) of the Complaint (Doc. 1, at 10) is that hearing officers deviated so frequently in their decisions from the grounds alleged in the notices as to be an unconstitutional custom. That theory fails on the facts.

HACM's entity liability under paragraph 26(a) of the complaint, however, goes to the execution of its various, conflicting income/household change reporting policies. There are at least four reporting policies. The "two weeks" policy refers to household composition, but

23

HACM disclaims that policy was applied. The "15 business day" policy, which HACM claims

was applied and that was quoted in the notice (Doc. 13-1, at 1), does not have a 15 working day

deadline, or any deadline for reporting changes in household composition. The two "15 working

day" policies (Doc. 13-18, at 1, 2) differ. One (Doc. 13-18, at 2) requires reporting changes in

household composition, but not in writing. The other requires reporting increases (but not

decreases) in income in writing, but not changes in household composition. (Doc. 13-18, at 1)   It

does not really matter which of these policies was executed. *Monell* liability flows from the

execution of the policy.  The federally protected right that execution of the policy deprives is the

statutory right in 42 U.S.C. § 1437d(k), implemented by 24 C.F.R. § 982.552(a), that the grounds

for adverse decision are only those contained in the federal regulation. There is no dispute that

HACM, as an entity, accepts the Bobot decision as its own. (Petty Aff., Ex. H; PSPFOF, ¶15)

See, *Pembaur v. Cincinnati,* 475 U.S. U.S. 469 (1986)

## II:      CERTIORARI REVIEW

Without regard to the § 1983 "and laws" claim, which requires a showing of a policy or

custom for entity liability,  the November 19, 2013, decision to uphold Ms. Coe's termination

from the program must be reversed under the state law *certiorari* review for the following

reasons: (1) the hearing officer based his decision on a ground not contained in the Notice of

Continued Eligibility, (2) the termination was based on grounds not permitted by federal law, (3)

the decision is based on insufficient evidence that Ms. Coe committed fraud in connection with

her household composition, and (4) the issuance of the decision was contrary to the timeframe

set forth in HACM's administrative plan.[9]

---

[9] Although Coe did not move for summary judgment on her state law claims she will argue the claims
here to address HACM's argument that its decision will prevail under state certiorari review.

Review by certiorari is limited to four issues: (1) whether the agency stayed within its jurisdiction; (2) whether it acted according to law; (3) whether its action was arbitrary, oppressive, or unreasonable, representing its will instead of its judgment; and (4) whether the evidence was such that it might reasonably have made the determination under review. *State ex rel. Smith v. City of Oak Creek*, 131 Wis. 2d 451, 455, 389 N.W.2d 366, 367 (Wis. Ct. App. 1986); *State ex rel. Richards v. Leik*, 175 Wis.2d 446, 455, N.W.2d 276, 280 (Wis. Ct. App. 1993). The issue of the sufficiency of the evidence falls within the third and fourth standards. *State ex rel. Harris v. Annuity & Pension Bd.*, 87 Wis. 2d 646, 651-52, 275 N.W.2d 668, 671 (Wis. 1979).

### A. HACM failed to follow the law when it Based Its Decision on a Ground Not Contained in Its July 2012 Notice.

HACM is required to cite the legal standard it is relying upon in its Notice. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S. Ct. 652 (1950); *Goldberg v. Kelly*, 397 U.S. 254, 267, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970). The purpose of a notice is to sufficiently inform a recipient of the reasons for the decision to terminate benefits so that the recipient has an effective opportunity to defend against the allegations. *Id.* at 268. By statute, public housing authorities are required to provide tenants who are participants of the Section 8 rent assistance program notice of the specific grounds of any proposed adverse action. 42 U.S.C. §1437*d(k).* In the § 8 Rent Assistance Program context, the notice must clearly identify both the facts claimed to be true and the legal standard being applied to those alleged facts. *See, Bratcher v. Housing Authority of the City of Milwaukee,* 2010 WI App 97, ¶ 23, 327 Wis. 2d 183, 787 N.W.2d 418; *Driver v. Housing Authority of the City of Racine*, 2006 WI App 42, 289

---

Additionally, it is not relevant to Ms. Coe's state certiorari claim whether HACM opted out of Chapter 68 because Coe's complaint in this litigation seeks certiorari review pursuant to common law (Doc. 1, p. 6)

25

Wis. 2d 727, 713 N.W.2d 670. See also, *Edgecomb v. Housing Authority of the Town of Vernon*, 824 F. Supp. 312, 314 (D. Conn. 1993).

The Notice in this case (Doc. 13-1) is silent on which specific ground HACM is invoking regarding household composition. The hearing examiner decision holds that Ms. Coe "fraudulently failed to report changes in her family composition." (Doc. 11-1, p. 109) Yet, none of the legal standards in the Notice govern occupancy standards or reporting requirements pertaining to a participant's household. (Doc. 13-1). The legal standards cited in HACM's notice of termination are: 24 C.F.R. § 982.552(c)(1)(iv) (fraud, bribery or other corrupt act), and 24 C.F.R. § 982.551(b)(1)(family obligation to supply information in an interim reexamination of family income and composition in accordance with HUD requirements); and the Housing Choicer Voucher Obligations of the Family § (B)(10)(The family must promptly notify the PHA in writing if any family member no longer lives in the unit) and § (C)(Any information the family supplies must be true and complete.) (Doc. 13- 1) HACM cannot now change its legal standard and claim that Ms. Coe committed fraud in connection with reporting changes in her household composition. Without notice of the legal standard HACM claims to assert, Ms. Coe was not given the opportunity to present evidence based on this legal standard, specifically the meaning of "occupancy" and "residence." By relying on this additional ground not contained in the June 10, 2012 notice, the decision is reversible. *See, Driver*, 2006 WI App 42, ¶ 15.

**B. HACM Failed to Follow the Law When It Based Its Decision to Terminate Ms. Coe from the Program on Grounds Not Permitted by Federal Law.**

HACM's Decision to uphold Ms. Coe's eligibility termination based on a failure to timely report her Precious Transit employment cannot be sustained on any federally permitted ground to terminate Housing Choice Voucher Program eligibility. This legal argument discussed

26

in Argument I A, above. This ground requires reversal on *certiorari* even if HACM did not have a *Monell* policy its agents executed.

Additionally, federal law mandates that a PHA must consider mitigating factors that may have contributed to the action or failure to act on the part of the family. 24 C.F.R. § 982.552(c)(2) Similarly, the federal regulation pertaining to the hearing decision makes it clear that the hearing officer must make factual determinations relating to the **individual circumstances of the family**. 24 C.F.R. § 982.555(e)(6); *Carter v. Lynn Housing Auth.,* 450 Mass. 626, 636, 880 N.E.2d 778, 785 (Mass. 2008). Specifically, HUD authorizes public housing authorities to consider "all relevant circumstances such as the seriousness of the case . . . ." 24 C.F.R. § 982.552(c) Here, the fact that Ms. Coe did not report her Precious Transit within 15 business days even though she was in the process of her annual recertification process is a mitigating circumstance the hearing officer should have considered before finding Coe can be terminated.

C.  **HACM Lacked Substantial Evidence to Sustain a Finding that Ms. Coe Had Unauthorized Household members.**

The fourth *certiorari* standard of review is whether the evidence was such that it might reasonably have made the determination under review. The test is whether the evidence reasonably supports the decision. *Williams v. Housing Authority of the City of Milwaukee*, 323 Wis.2d 179, 186 779 N.W.2d 185, 189 (Wis. Ct. App. 2009)(internal citations omitted) There are three reasons why HACM lacks substantial evidence in this case. First, HACM relies on inadmissible hearsay as evidence that Mr. Portis had lived with Mr. Coe. In Wisconsin, an administrative agency may not make a finding of fact based only on inadmissible hearsay. *Gehin v. Wis. Group Ins. Bd.*, 2005 WI 16, ¶ 4, 278 Wis. 2d 111, ¶ 4, 692 N.W.2d 572, ¶ 4; *Williams v.*

*Hous. Auth. of the City of Milwaukee,* 2010 WI App 14, ¶ 13, 323 Wis. 2d 179, 189, 779 N.W.2d 185, 187. In *Gehin*, the Supreme Court of Wisconsin held that uncorroborated written hearsay, controverted by in-person testimony, does not constitute substantial evidence to support findings of fact that result in an administrative decision to terminate benefits. *Gehin v. Wis. Group Ins. Bd.*, 2005 WI 16, ¶ 4, 278 Wis. 2d 111, ¶ 4, 692 N.W.2d 572, ¶ 4. The benefits in question were income continuation benefits, and the hearsay documents were medical reports. *Id.* at ¶ 1.

The rule was not followed in the Decision in this case as the hearing examiner basis his finding of fact that Danta Portis was living with Ms. Coe on two uncorroborated written hearsay documents: the municipal court record that indicates Ms. Coe's prior address as Mr. Portis' current address in April 2010, and hand written notes contained at the time of the April 19, 2010 meeting. (Doc. 11-2, p. 110). At the informal review hearing, Ms. Coe contradicts this written hearsay with her testimony. She testifies that Mr. Portis never lived with her, but would stay the night occasionally. (Doc. 13, p. 308, ll. 22-24, p. 314, ll. 17-22). Additionally, use of a rent assistance participant's address by some other person as a mailing address is not a violation of federal regulations. *Driver v. Housing Authority of the City of Milwaukee,* 2006, WI App 42, ¶ 9, 289 Wis. 2d 727, 713 N.W.2d 670.

Second, it is not substantial evidence to base a finding that the Portis family lived with Ms. Coe on Loberg's inconsistent version of the April 19, 2010 meeting as to what Ms. Coe said or did not say. Loberg's testimony at the second hearing that is based on her memory is riddled with inconsistencies. She gives three different accounts of what Coe said about the Portis family moving into her unit. Loberg testifies that Ms. Coe said she didn't remember when the family moved in. Loberg contradicts this statement when she testifies that Ms. Coe said it was in November. Then, Ms. Loberg contradicts this and states that Coe said January. (PSPFOF, ¶ 4

28

Doc. 13, p. 186 – 188.)  The memo that she created is inconsistent with at least one version of her testimony that Ms. Coe knew the family moved in January because the memo states November.  (Doc. 13-3).

Third, the hearing examiner incorrectly relies on a statement he attributes as Ms. Coe's own testimony when in fact it is actually Loberg's inconsistent testimony he is citing.  (11-2, p. 110).  He relies on Loberg's testimony in making a finding of creditability of Ms. Coe which cannot be substantial evidence as it is inherently wrong.

**D.      HACM  Lacked Substantial Evidence to Terminate the Plaintiff from its Rent Assistance Program based on a finding of "fraud" in connection with Ms. Coe's family composition.**

HACM argues in its brief that the Decision to terminate Ms. Coe for committing fraud is supporting by substantial evidence.  (Doc. 21, p. 32).  HACM ignores the law.  A thorough discussion of HACM's misguided finding of fraud is contained on pages Coe's brief in support of her motion for summary judgment. (Doc 26, at 22-23).

**E.      The Hearing Decision Was Untimely.**

Contrary to 24 C.F.R. § 982.555(6), and HACM's own administrative plan, the Result of the Hearing Decision dated November 19, 2014 is untimely.[10]  Pursuant to federal law, HACM is required to furnish a copy of the Decision "promptly" to the family.  24 C.F.R. § 982.555(e)(6). Here, the decision was dated November 19, 2013, which is seven months from the submittal of the last brief in April 8, 2013.  (Doc. 11-2, p. 90, p. 111)

Most significantly**,** the date of HACM's Decision violates is own Administrative Plan.

---

[10] HACM incorrectly asserts it in brief (Doc. 21) that counsel for Coe waived the 14-day requirement when he stated we can wait for the decision.  What he meant was that we can wait because he would like to request a briefing schedule in which case the hearing record on review would not be complete yet. Contrary to HACM's assertion, this is not evidence of waiver.  (Pl.'s Resp. to DPFF, ¶¶ 91, 92).

The Wisconsin Supreme Court has determined that in the context of certiorari review, the phrase "acting according to law" includes the "common law concepts of due process and fair play." *State v. Goulette*, 65 Wis.2d 207, 215, 222 N.W.2d 622, 626 (1974). Additionally, administrative rules have the "same force and effect of law." *State ex rel. Staples v.* DHSS, 115 Wis.2d 363, 367, 340 N.W.2d 194, 196 (1983). Here, HACM failed to follow its own administrative hearing procedures that require a hearing decision be issued within 14 calendar days of the date of the hearing. (Petty Aff., Ex. E, [2011 Admin. Plan, Section 22.4, p. 85]). Ms. Coe's hearing concluded on April 3, 2013 with the last brief submission, and the Decision by the hearing officer was issued seven months later on November 19, 2013. It is hypocritical to obligate a participant to an inconsistent reporting policy when HACM violates its own procedures and issues a written decision well after its 14 calendar day requirement.

## CONCLUSION

For the reasons stated about, the court should deny the defendant's motion for summary judgment.

Dated this 5th day of December, 2014.

s/ Erika Jacobs Petty
Erika Jacobs Petty
State Bar No. 1059488
ejp@legalaction.org
(414) 278-7777 x. 3008

s/Jeffery R. Myer
Jeffery R. Myer
State Bar No. 1017339
jrm@legalaction.org
(414) 278-7777 x. 3042

Legal Action of Wisconsin, Inc.

230 W. Wells Street
Milwaukee, WI 53203
Attorneys for Plaintiff – Takia Coe